IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 1:06-CR-00134 CDP |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| MICHAEL MEADOR, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION OF DEFENDANT MICHAEL MEADOR TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM IN SUPPORT

COMES NOW Michael Meador, by and through his attorneys Christopher E. McGraugh and Burton Shostak, and incorporate by reference their Motion to Suppress Evidence and Suppress Statements and without waiving objection to the admission of any evidence obtained in violation of Defendant's Fourth, Fifth and Sixth Amendment rights under the United States Constitution, makes reference to certain facts and issues below in his Memorandum in Support thereof, states the following:

## FACTS SURROUNDING THE SEIZURE OF EVIDENCE AND STATEMENTS

**I.**     Michael Meador went to the Ste. Genevieve County Sheriff's Department on April 27, 2006 at approximately 7:30 a.m.  (TR p. 21).  Law enforcement had developed Michael Meador as a suspect in the homicide of Sergio Burgos Gonzalez.[1]  (TR p. 34).  Mr. Meador was advised that the Missouri State Highway Patrol would come to the Ste. Genevieve County Sheriff's Department to interview him and he was to wait for them at the Sheriff's Department. (TR p. 21, 36).  After one hour, Sgt. Mills arrived and interviewed Mr. Meador.  (TR p. 21).

---

[1] Sergio Burgos Gonzalez is also referred to as Sergio Burgos.

The interview was conducted in a small windowless room.  (TR p. 39).  It was observed by other law enforcement officers.  (TR p. 39-40).  Sgt. Mills was carrying a service revolver in a holster in his hip and sat at the door which was the entryway and egress to the interview room. (TR p. 40).  The interview room had the capacity of videotape which was utilized for only a portion of the interview.  (TR p. 27, 38-39, 46-47).  The unvideotaped portion of the interview was approximately 30 minutes.   (TR p. 40).   The Miranda Rights that were allegedly administered to Mr. Meador were not captured on videotape.  (TR p. 47).  During the interview, Mr. Meador had told Sgt. Mills that he had not intended for anyone to be killed and that he was a middleman in a drug transaction and that the individuals who were responsible were still at large. (TR p. 45).  Accordingly, he was fearful for his and his family's safety of retributions from the actual killers and there were areas he would not discuss with law enforcement due to this apprehension.  (TR p. 45).

Sgt. Mills advised that Mr. Meador could be charged with felony murder given his statement.  (TR p. 45, 47).  Sgt. Mills chose not to arrest him at that time, but released him with the caveat that law enforcement would be in contact with him later.  (TR p. 48).  Accordingly, Mr. Meador gave all of his contact information to Sgt. Mills.  (TR p. 48).

Eight and a half hours later, two officers, Lt. Craig of the Ste. Genevieve County Sheriff's Department and Sgt. Bauer of the Missouri State Highway Patrol came to Michael Meador's parent's home with the intent to take him into custody.  (TR p. 54, 75).  An arrest warrant was issued on April 27, 2006 at 16:30 hours, and was in the possession of the officers. (TR p. 64).  When Mr. Meador arrived home, he was met by Lt. Craig and Sgt. Bauer.  (TR p. 64).  Both officers were in law enforcement attire and were wearing side firearms.  (TR p. 65, 74).  At that time, Mr. Meador advised the officers that he was armed and lifted his shirt to demonstrate that he was in possession of a firearm in his waist belt.  (TR p. 66).  Sgt. Bauer

2

immediately disarmed Mr. Meador.  (TR p. 66).  Michael Meador advised that he was illegally carrying a concealed weapon.  (TR p. 67).  The officers were later advised that the weapon Mr. Meador possessed was for his family's safety as he feared retributions from the actual killers. (TR p. 78).

A second interview was conducted by Sgt. Gregory at 6:34 p.m.  (Govt. Ex. M-4).  This interview was captured on a videotape.  (TR p. 108).  This interview was conducted at the Ste. Genevieve County Sheriff's Department and Mr. Meador was not free to leave the Sheriff's Department.  (TR p. 108).  At this interview, Mr. Meador reiterated the information that he had given to Sgt. Mills, that he had not intended for anyone to be hurt and that he was a middleman in the midst of a marijuana transaction and that he had no plan or intent that Sergio Burgos Gonzalez be killed.  (TR p. 126).  Sgt. Gregory attempted unsuccessfully to explain the concept of felony murder but Mr. Meador did not understand, at which time Mr. Meador terminated the interview.   (TR p. 111).   After several attempts to terminate the interview, Sgt. Gregory continued to question and interrogate Mr. Meador.  (Govt. Ex. M-5).  Eventually, the interview was terminated after Mr. Meador requested an attorney.  (TR p. 95).  Sgt. Gregory testified that the information learned by the second interview was included in the affidavit for probable cause for the search warrant at Mr. Meador's family's home.  (TR p. 120).

On April 27, 2006 at 19:40 hours, Lt. Craig attempted to secure the dwelling for a search warrant prior to the application and execution of the warrant.  (TR p. 68).  Lt. Craig testified that while outside the home, he smelled a strong scent of green marijuana.  (TR p. 68).  Additionally, Lt. Craig advised Virginia Cates that it was necessary for him to enter the dwelling.  (TR p. 86). Once in the dwelling, Lt. Craig testified that he continued to smell the concentration of marijuana.  (TR p. 68).  Lt. Craig testified that given the concentration of the smell that the marijuana would have to be in close proximity to him or it would have to be a large amount.

(TR p. 79).  Lt. Craig upon visual inspection saw no indication of the presence of marijuana.  (TR p. 79).  Interestingly, after the search warrant was executed, no marijuana was found at the residence.  (TR p. 121).

Acting on information from other investigators, Sgt. Bauer testified that he obtained the consent to search the Ford Explorer from Virginia Cates.  (TR p. 7).  No effort was made to obtain a search warrant.  (TR p. 52).  No consent to search the Ford Explorer or cell phone was requested of Michael Cates or Michael Meador.  (TR p. 14-15, 52, 59).  It was Sgt. Bauer's belief, based on information from other investigators, that the Ford Explorer was driven by Michael Meador sometime around the homicide.  (TR p. 14).  No attempt was made to determine the ownership of the Ford Explorer, although that information was readily available by the Missouri State Highway Patrol.  (TR p. 13, 16).  No determination was made as to who had keys or who had operated the Ford Explorer during any time period.  (TR p. 14).  No evidence was elicited by the government to suggest that exigent circumstances existed at the time of the search.  In fact, the vehicle at the time of the search was parked at an automobile repair shop.  (TR p. 32).

The search of the vehicle including all packages and compartments of the vehicle.  (TR p. 54).  Sgt. Mills testified that he found receipts and an envelope which contained what he believed to be marijuana seeds.  (TR p. 53-56).  No analysis had been performed to determine the substance of the actual contents of the envelope.  (TR p. 53).  Sgt. Mills also found in a closed console of the vehicle a cell phone.  (TR p. 50).  The cell phone was bagged in and placed in evidence.  (TR p. 50).  A number of days later, Sgt. Bauer activated the cell phone, navigated the menu of the cell phone to access a call history and address book.  (TR p. 56).

On June 12, 2006, after Michael Meador was charged and represented by counsel, FBI Special Agent Stapleton contacted Sgt. Heath that an inmate James Lundry sought to cooperate with law enforcement officers while presently awaiting an unrelated charge in the New Madrid

4

County Jail.  (TR p. 158).  Lundry had advised agents that he had numerous conversations with Michael Meador agreed to wear an audio recording device in order to capture these conversations with Mr. Meador about an alleged murder for hire agreement and the Gonzalez homicide.  (TR p. 161).  Sgt. Heath was told by Lundry that he was a cellmate of Michael Meador and that Meador often spoke regarding the Burgos Gonzalez homicide.  (TR p. 159). Sgt. Heath met James Lundry on three occasions.  (TR p. 178).  He secured two audio recordings.  (TR p. 173)  The initial audio recordings were not contemporaneously monitored by law enforcement.  (TR p. 172).  Portions of the second tape are unintelligible as they were captured on a handheld monitoring device which was turned off and on by Lundry.  (TR p. 173) Sgt. Heath stated that he advised James Lundry to not initiate conversations regarding the Gonzalez homicide, however if Mr. Meador wished to discuss it he was to listen, but attempt to change the subject.  (TR p. 164).  Two recordings were submitted to the Court.  (Govt. Ex. M-10 and M-11).  The first recording occurred on June 20, 2007, was approximately five hours long and was a fitted audio device.  (TR p. 175).  The second represented a tape which Mr. Lundry made from a handheld device which he could turn on and off at his discretion.  (TR p. 176).  The recordings reflect Mr. Lundry initiates conversations regarding the Gonzalez homicide.

### I.      THE SEARCH OF THE FORD EXPLORER AND ITS CONTENT WAS IN VIOLATION OF MICHAEL MEADOR'S FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEARCH AND SEIZURE.

The search of the Ford Explorer was a warrantless search.  In the government's response, the government suggests that the search of the Ford Explorer was pursuant to the owner's consent.  (Government's Response p. 25).  In the response, the government states that since Virginia Cates voluntarily consented to the search of the Explorer and its contents, as the legal owner of the Explorer she had the actual authority to consent.  At the hearing on the Motion to

Suppress, the government offered no evidence that Virginia Cates was the actual owner of the vehicle or had authority to consent to its search.

In fact, Virginia Cates is not the owner of the vehicle and the vehicle is actually registered to Michael Cates.  (See Defendant's Exhibit B).  In addition, the government offered no evidence to suggest the officers had a reasonable belief that Ms. Cates was the owner of the vehicle.  The officers testified that they assumed Ms. Cates was the owner of the vehicle.  They made no inquiry to Mr. and Mrs. Cates as to who the owner of the vehicle was.  (TR p. 13).  They made no determination of who possessed the keys to the Ford Explorer.  (TR p. 14).  Although the information was readily available through their database, they made no attempt to determine who the actual owner was.  (TR p. 16).  They made no determination as to who the primary driver of the vehicle was.  (TR p. 13).  They made no determination of whether Virginia Cates ever operated the vehicle.  In short, the government provides no factors for which the officers could reasonably believe that Virginia Cates had ownership or authority to consent to the search of the vehicle.

Consent to search as a valid exception to the warrant requirement may be given either by a suspect or by some other person who has common authority over or sufficient relationship to the item to be searched.  United States v. Matlock, 415 U.S. 164 (1974).  Common authority is a function of mutual use, joint axis and control.  United States v. Bradley, 869 F.2d 417, 419 (8th Cir. 1989).  Common authority is a question of fact.  United State v. Baswell, 792 F.2d 755, 758 (8th Cir. 1986).  In Illinois v. Rodriguez, 497 U.S. 177, 185-6 (1990), the Supreme Court determined the rule for a law enforcement officer's reliance on the consenting party's apparent authority is not that they always be correct, but they always be reasonable.

Determination of whether the government's reliance on Ms. Cates' consent was reasonable is a question of law.  United States v. Jones, 269 F.3d 9919, 9927 (8th Cir. 2001).  The

ultimate determination of reasonableness under the Fourth Amendment is a question of law which is reviewed de novo.  United States v. Ringould, 335 F.3d 1168, 1171 (10th Cir. 2003). Ultimately, the question is would the facts available to the officer at the time of the consent warn a person of reasonable caution in the belief that the consenting party had authority over the term to be searched.  Rodriguez, 497 U.S. at 188.  See also, United States v. Sanchez, 32 F.3d 1330, 1333-5 (8th Cir. 1994).

Michael Meador was interrogated for approximately two and a half hours prior to the search of the Ford Explorer.  Neither Sgt. Mills nor Sgt. Gregory made any inquiry related to the Ford Explorer during the 150 minutes of interrogation.  (TR p. 14).  Sgt. Mills testified that he believed that the primary operator of the Explorer was Michael Meador.  (TR p. 16).  As of the date of the hearing, Sgt. Mills had no idea who the actual owner of the vehicle was.  (TR p. 13). Although, the Missouri State Highway Patrol had the resources and ability to determine the actual owner of the vehicle, they chose not to determine the owner of the vehicle, even as of this date.  The Missouri State Highway Patrol was unsure who possessed keys to the vehicle.  (TR p. 14).  Further undermining the belief that Virginia Cates had authority to give consent to search the Explorer, was the fact that the automobile was not on the Cates' property, but was parked at an auto tire store.  (TR p. 32).  Sgt. Bauer testified that he was told by an unknown, unidentified source that the vehicle was owned by Virginia and Michael Cates.  (TR p. 14)  Sgt. Bauer at the time of securing the consent for search of the vehicle by Virginia Cates, based his assumption that Ms. Cates had authority to give her consent on two factors only, that Michael Meador had driven the Explorer and that Michael Cates and Virginia Cates owned the vehicle.  The latter of which he had no factual basis to support this conclusion.  Both pieces of information came from second party sources.  There was no reasonable, reliable information for the officer to base his

belief that Virginia Cates had apparent authority to consent to the search of the Ford Explorer when in fact she did not.   See United States v. James, 353 F.3d 606, 615 (8th Cir. 2003).

### I (a).   THE SEARCH OF THE CELL PHONE CONTENTS VIOLATED MICHAEL MEADOR'S FOURTH AMENDMENT RIGHTS.

The search of the contents of the cell phone was a warrantless search.  At the hearing, Sgt. Mills testified that he conducted the search of the Ford Explorer.  Sgt. Mills testified that he located the cell phone in a closed console of the Ford Explorer.[2]  (TR p. 50).  After the officer located the cell phone in the console, he placed it into evidence and secured it into evidence.  (TR p. 50).  Two days after seizure and placement of the cell phone into evidence, after Mr. Meador was placed in custody, Sgt. Mills activated the cell phone accessed its menu and seized the internal stored information within the cell phone related the to call history and contact information.  (TR pp. 56-51).  Prior to Michael Meador's arrest and prior to its search and seizure, the cell phone was identified as Michael Meador's phone.  (TR pp. 32-33).  The government attempts to persuade the Court that search of the cell phone under four conflicting theories:  that Mr. Meador had no protected interest in the cell phone, that the cell phone was obtained pursuant to the consent to search the Ford Explorer, exigent circumstances existed in the possibility of lost information, and that the officers had probable cause to search the contract of the cell phone.

The government's position is without merit and contrary to the evidence at the hearing. Mr. Meador certainly had a privacy interest in the contents of the cell phone.  As stated above, law enforcement had identified the cell phone as Michael Meador's.  He was questioned by Sgt. Mills regarding the cell phone, the number and its use.  (TR p. 52).  Members of the Missouri State Highway Patrol were gathering records of the use of the cell phone prior to the search.  (TR

---

[2] Meador incorporates by reference his objection to the search of the Ford Explorer as Virginia Cates had no apparent authority to consent to the search.

p. 35).  The contents on the cell phone not only contained call history information, but also personal information known only to Michael Meador, not accessible to facilities of telephone services.  (TR p. 51).  Clearly, Michael Meador had an expectation of privacy to the information contained in the stored information on his cell phone.

As stated above, the consent to search the Ford Explorer by Virginia Cates was not a valid consent to overcome the warrantless search in violation of the Fourth Amendment.  Even if you were to assume in arguendo that the consent was valid for the search of the automobile, it certainly did not extend to the contents of Michael Meador's cell phone.  The basis for the desire to search the Ford Explorer was that law enforcement believed that Michael Meador had driven the car.  No facts were elicited at the hearing to give rise to a reasonable belief that Virginia Cates owned, operated or even occupied the Ford Explorer prior to its search, much less had any knowledge of an existence of a cell phone in a closed console of the Explorer.  Therefore, there is no evidence to suggest that Virginia Cates intended, or that a reasonable belief could be formed, that a valid consent was given to search the contents of the cell phone by Virginia Cates.

A consensual search may not extend the scope of the consent given.  United States v. Randolph, 970 F.2d 467, 468 (8th Cir. 1992).  The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness, what would the typical, reasonable person have understood by the exchange between the officer and the suspect. Florida v. Jimeno, 500 U.S. 248 (1991).

The government contends in its response that the officers were justified in the search of the contents of the cell phone based on probable cause upon finding purported marijuana seeds. Interestingly, this is the first indication of the use of the probable cause doctrine as it relates to the Ford Explorer as the government premised its warrantless search of the Ford Explorer based on the consent of Virginia Cates.  No evidence was offered at hearing that the officers premised

their search of the contents of the cell phone based on probable cause upon finding the alleged marijuana seeds.  The government offers no nexus between the finding of alleged marijuana seeds and the contents of Mr. Meador's phone.

The definition of probable cause for a search is set out in <u>Illinois v. Gates</u>, 462 U.S. 213, 239 (1983), which states, the task of the judge reviewing the actions of the police officer is to make a practical, common sense decision whether, given all the circumstances known to the police, including the veracity and basis information, there is a fair probability that contraband or evidence of a crime will be found in that particular place.  Probable cause exists when there are facts and circumstances within the knowledge of the seizing officer that are sufficient to warrant a person of reasonable caution to have a belief that the offense is being committed or that the contents of the car offend the law.   <u>Id</u>.

Even if one was to assume that the seizure of the cell phone itself was valid based on Virginia Cates' consent or that the officers had probable cause upon finding the alleged marijuana seeds, the validity of either search could not be extended to the contents.  The timing of the seizure of the contents are particularly significant.  The cell phone was already taken into evidence before its contents were seized.  (TR p. 56).  The Missouri State Highway Patrol had ample opportunity to apply for a search warrant for the Ford Explorer, as well as the contents of the cell phone as they applied for the search warrant of the Cates' residence the evening of April 27, 2006; wherein the search of the Explorer and the search of the phone and its contents was not done until April 28, 2006 and May 1, 2006, respectively.  (TR p. 53).   Neither the Ford Explorer nor the cell phone were in the possession of Mr. Meador or the Cates.  (TR p. 32).

The evidence at hearing was overwhelming that law enforcement knew of the existence of both cell phone, its contents, and the automobile prior to its application for a search warrant of the residence.  More properly, law enforcement could have seized either or both the Explorer

and/or the cell phone pending issuance of a warrant to examine its contents if truly the exigencies of the circumstances truly demanded it.   See, United States v. Chadwick, 433 U.S. 1 (1977) (police may seize suitcase warrantless but must get warrant to get inside suitcase); United States v. Hall, 142 F.3d 988 (7th Cir. 1998) (where law enforcement authorities have probable cause to believe that container holds contraband or evidence of a crime, but have not secured a warrant the court has interpreted the Fourth Amendment to permit seizure of the property pending issuance of the warrant to examine its contents).  Mincey v. Arizona, 437 U.S. 385 (1978) (the burden is on the state to show they need a search and the reasonableness of the police that a warrant could not be obtained).

Lastly, the government contends that the search of the contents of the cell phone was valid based on the existence of exigent circumstances that there was a possibility of lost information related to the contents of the phone.  The government offered no evidence of this at hearing.  The government offered no evidence that the officers believed that they may lose the information contained within the cell phone.

The existence of exigent circumstances does not excuse the probable cause requirement to search the area in question, nor may the exigency relied upon be one which is created by the government's failure to timely secure a warrant.  United States v. Johnson, 9 F.3d 506, 509 (6th Cir. 1993); United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984).  The burden necessary to prove the existence of exigent circumstances is a heavy one and will not be easily met by the government.  Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984).

The issue of dealing with the search of a cell phone contents was taken up in the matter of United States v. Edward Park, 2007 W.L. 152153 (N.D.C.A.)  In Park, a district court granted a motion to suppress evidence of information seized upon a search of the contents of a cell phone as the court did not believe it fell within the exception of the Fourth Amendment warrant

requirement.  Id.  In Park, the government contended that the search of the contents of the cell phone was an exception to the Fourth Amendment warrant requirement as it was done incident to a lawful arrest.  Id. *2.  As in the case at bar, the cell phone was seized at evidence and a day later its contents were accessed and seized.  Id. *8.   The Park court found that the cell phone could not be considered a possession within the arrestee's immediate control and not part of the person.  Id. *9.  The Park court noted that modern cell phones have the capacity of storing immense amounts of private information unlike pagers or address books, modern cell phones record incoming and outgoing calls and can also contain address books, calendars, voice and text messages, emails, video and pictures.  Id. *8.  Individuals can store highly personal information on a cell phone and can record their most private thoughts and conversations on the cell phone through email, text, voice and instant messages.  Id. *8.  The Park court was unwilling to extend the doctrine of warrantless search of contents of cell phones to effectively permit the warrantless search of a wide range of electronic storage device as a search incident to an arrest, particularly given the quality and quantity of information that can be stored on a cell phone, cellular phones should not be characterized as an element of an individual's clothing or person but rather as a possession within the arrestee's immediate control.  Id. *9.  The Park court distinguished the search of pagers, since a pager's memory can be affected by incoming and outgoing calls.

The reasoning in Park should be extended to this case as the factors are consistent.  As in Park, the government tends to rely on factors supporting a warrantless search, i.e., consent.  Even though Mr. Meador disputes the consent, the search of the contents of the cell phone extend beyond the search of the automobile.  As in Park, even if one assumes the seizure of the cell phone may be appropriate; however, the seizure of the information contained within the cell phone requires an additional step.

II.     **MEADOR'S SECOND STATEMENT VIOLATES THE FIFTH AMENDMENT.**

A.     **Defendant Michael Meador was in custody.**

Miranda warnings are required before the commencement of a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444-5 (1966).   Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way.   Id.   See also, Illinois v. Perkins, 496 U.S. 292, 296 (1990); Oregon v. Mathiason, 429 U.S. 492 (1977).  In Thomas v. Keohane, 516 U.S. 99, 465 (1995), the court held that the degree of confinement requires two discrete inquiries…first, what were the circumstances surrounding the interrogation and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Id. at 112.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'  Id.  In Stansbury v. California, 511 U.S. 318, 323 (1994), the Supreme Court explained that the initial determination of custody depends on the objective circumstance of the interrogation, not the subjective use harbored by either the interrogating officer or the person being questioned.  The court reasoned that the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.  Id.

The courts have also considered the government's investigary focus on the accused. Particularly this is a relevant factor when it is communicated to the suspect.  Stansbury v. California, 511 U.S. 318, 325 (1994).  See also, U.S. v. Streifel, 781 F.2d 953, 959 (1st Cir. 1986).  Uncommunicated intent of police to prevent suspect from leaving was not a factor in determining whether the suspect thought they were free to leave.  In Withrow v. Williams, 507

U.S. 680 (1993), the defendant was in custody for Miranda purposes when officers threatened to lock him up in an attempt to force him to make a statement.

The location of the questioning is also significant.  Questioning at a police station has an inherently coercive effects on an accused.  Dunaway v. New York, 442 U.S. 200 (1979).  In Dunaway, the defendant was taken to the police station for questioning.  The court held that the questioning was custodial even though it was conducted during an investigatory rather than an accusatory stage.  Id. at 214.  In the case at bar, the Missouri State Highway Patrol chose not to reinterview Mr. Meador by telephone, nor did they choose to interrogate him at his home.  It was then clear from their intention that they intended to take Mr. Meador into custody, transport him to the sheriff's department for further questioning.

It is certainly reasonable for Michael Meador to form a belief he would be taken into custody.  Lt. Craig testified that at the time of his approaching Mr. Meador on the afternoon of the 27th, Mr. Meador was subdued by Sgt. Bauer.  (TR p. 66).  In addition, Lt. Craig testified that Sgt. Bauer advised Mr. Meador that he was carrying a concealed weapon in violation of Missouri state law.  (TR p. 67).  Sgt. Mills testified that he advised Mr. Meador that he had confessed to a crime of felony murder.  (TR p. 45, 48).  Accordingly, Sgt. Mills testified at that end of the interview he advised Mr. Meador of his exposure to felony murder and asked for contact information.  (TR p. 48).

### B.    Defendant Meador invoked his right to remain silent.

After an individual is read his Miranda rights, if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  Miranda v. Arizona, 384 U.S. 436, 473-4 (1966).  The individual has to give "a clear consistent expression of a desire to remain silent" in order to properly invoke his right to remain silent.  United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989).  To determine whether

defendant has unequivocally invoked his right to remain silent, the defendant's statements are considered as a whole.  Simmons v. Bowersox, 235 F.3d 1124, 1131 (8th Cir. 2001).  A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of his right to remain silent.  If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent and they may proceed with the interrogation.  Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994).  Once a defendant has properly invoked his right to remain silent, his right must be scrupulously honored.  Michigan v. Mosely, 423 U.S. 96 (1975).  There are several factors to consider when determining whether defendant's right to cut off questioning has been scrupulously honored.  Those factors are:  (a)  whether the police immediately ceased the interrogation upon the defendant's request; (b) whether they resumed questioning only after a passage of a significant period of time and provided fresh Miranda warnings; and (c) whether they restricted later interrogations to a crime that had not been subject to the first interrogation. Id. at 106.

At the hearing, the government offered as an Exhibit M7 which purports to be a videotape of Sgt. Gregory's interview of Michael Meador.  During that videotape, Mr. Meador states to Sgt. Craig:

"I don't want to tell you." Display (10)[3].

Again, at Display (12) he states:

"I don't want to tell you."

The videotape depicts that Sgt. Gregory continued the interview.

At Display (32), Mr. Meador states:

"This conversation is done.  I've told you everything you need to know."

_____

[3] Number represents the display at which the statements were made.

At Display (33), Mr. Meador states:

"There's no use in us talking let's get it done."

The videotape then demonstrates through his demeanor Mr. Meador's intent not to make any further statements.  In fact, Mr. Meador is instructed to sit down and Sgt. Gregory leaves the room to obtain an arrest warrant which he advises Mr. Meador of same.  Upon reentering the room, Sgt. Gregory again reinitiates the interview:

"Let me ask you one more thing."  (Display 37).

Mr. Meador states:

"Let's quit talking about it."  (Display 39).

After Sgt. Gregory reads the arrest warrant to him, he again initiates more interrogation. (Display 41).  Mr. Meador again states "This conversation is done," and again, Sgt. Gregory reinitiates the interrogation.  (Display 42).  Once again, Mr. Meador states to Sgt. Gregory, "That's all I can tell you," at which time Sgt. Gregory leaves the rooms.  (Display 44-45).  Sgt. Gregory returns back to the interrogation room, at which time, Mr. Meador again states, "I am not having this conversation."  (Display 50).  Finally, Mr. Meador states to Sgt. Gregory, "I am not talking with you…let's get a lawyer so I can head to court."  (Display 51).

In Michigan v. Mosely, 423 U.S. 96, 100 (1975), the Supreme Court stated:

> Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to our during questioning, that he wishes to remain silent, the interrogation must cease.  At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than a product of compulsion, subtle or otherwise.  Without the right to cut off questioning, the setting of in custody interrogation operates on an individual to overcome free choice in producing a statement after the privilege has once been invoked.

Invocation like waiver of rights under Miranda can be expressed or implied.  North Carolina v. Butler, 441 U.S. 369, 373 (1979); see also, United States v. Heldt, 745 F.2d 1275, 1278 (9th Cir. 1984) (refusal to sign a written waiver may actually constitute an invocation of

rights).  A simple refusal to speak or to answer questions has been held to be an invocation.  In Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983), the Supreme Court clarified the initiation of conversation by an accused does not constitute an automatic waiver of previously invoked rights. The burden remains on the prosecution to show that the subsequent events indicate a waiver.  Id. As with original waivers, any subsequent waiver must be voluntary and intelligent.  Id. at 1046.

Clearly, Mr. Meador invoked his right to remain silent on numerous occasions during this interview.  At each juncture, Sgt. Gregory continued the interrogation.  Upon the Court's review of Exhibit M7, it clearly demonstrates Mr. Meador's intent not to continue the interrogation and asserts his right to remain silent.  The setting and demeanor of the interrogation clearly operated on Mr. Meador to overcome his free choice in producing a statement after his privilege had been invoked.

### III.    DEFENDANT MEADOR'S STATEMENTS TO LUNDRY VIOLATE THE FIFTH AND SIXTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

In the government's response, the government contends that the statements made to James Lundry did not violate Michael Meador's Fifth and Sixth Amendment rights because Meador did not perceive that he was talking to a government agent as it relates to charges of a murder for hire plot against Scott Pepper.  (Government's Response p. 31).  Consequently, since Meador was not charged or appointed an attorney for the purposes of the murder for hire plot, Mr. Meador cannot be afforded his protections under the Fifth and Sixth Amendments guaranteed under Miranda v. Arizona, 384 U.S. 436, 473-4 (1966) and Massiah v. United States, 377 U.S. 201 (1964).  The government's contention is not supported by the facts elicited at Mr. Meador's pretrial hearing nor by United States Supreme Court precedent.

In <u>Massiah v. United States</u>, 377 U.S. 201 (1964), the Supreme Court held that the government violated the Sixth Amendment rights of an accused when it deliberately elicited incriminating information from an indicted defendant who was entitled to assistance of counsel. In <u>Massiah</u>, the government agents outfitted the informant's automobile with radio transmitting equipment and instructed the informant to engage the defendant in conversation related to the crime.   In suppressing statements overheard during the resulting conversation, the Supreme Court emphasized that the Sixth Amendment must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse.  <u>Id</u>. at 206.

The government knew that Mr. Lundry was to elicit statements from Mr. Meador regarding the homicide for which he was charged and the murder for hire plot.  In fact, the government was well aware of the potential and the likelihood of eliciting statements regarding the Gonzalez case, as well as the Pepper case.  To that end, Sgt. Heath instructed Mr. Lundry that Mr. Meador may discuss the Gonzalez homicide; however, he was to listen to it and attempt to redirect the conversation.  (TR p. 164).  Ultimately, the investigation was abandoned and no criminal charges were filed.  (TR p. 176, 183).  The evidence at the hearing suggests the investigation in the murder for hire plot was pretextual for Lundry to attempt to elicit statements regarding the charged homicide.  As such, the facts of this case most closely resemble those of <u>United States v. Henry</u>, 447 U.S. 264 (1980).

In <u>United States v. Henry</u>, 447 U.S. 264 (1980), Henry was indicted on the armed robbery of a bank.  While he was in jail pending trial, government agents contacted an informant who then was an inmate confined in the same cell block as Henry.  <u>Id</u>. at 268. An agent instructed the informant to be alert to any statement made by the federal prisoner, but not to initiate conversations with or questions respondent regarding the charges against him.  <u>Id</u>. at 267-8. After the informant had been released from jail, he reported to the agent that he and Henry had

engaged in conversation and that Henry made incriminating statements about the robbery.  Id. The informant was paid for furnishing the information.  At Henry's trial, which resulted in a conviction, the informant testified about the incriminating statements that Henry had made to him. Id. at 268

The Supreme Court held that Henry's statements to the informant should not have been admitted at trial as the government had intentionally created a situation likely to induce the defendant to make incriminating statements without the assistance of counsel.  Id. at 273.  As such, the government violated the defendant's right to counsel.  Id.  The Supreme Court stated:

> An accused speaking to a known government agent is typically aware that his statements may be used against him.  The adversarial positions at that stage are well established.  The parties are at arm's length adversaries.  By comparison, when the accused is in the company of a fellow inmate who is acting by prearrangement as a government agent the same cannot be said.  Conversations stimulated in such circumstances may elicit information that an accused may not intentionally reveal to persons known to the government agents.  Indeed, the Massiah court noted that if the Sixth Amendment is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. The Massiah court pointedly observed that Massiah was more seriously imposed upon because he did not know that his co-defendant was a government agent. Id.

The government concedes that law enforcement knew that Mr. Meador was speaking freely to Lundry about the Gonzalez homicide as well as this alleged Pepper murder for hire plot. As to the murder for hire plot, the subject, Scott Pepper, was alleged to have taken part of the money delivered by Sergio Burgos Gonzalez which was ultimately the transaction which led to Mr. Gonzalez's death.  The government's evidence suggests that the events – the murder for hire plot and the Gonzalez homicide – are intertwined to a degree that discussion of one event could stimulate conversation of the other.  Additionally, the government's proffered exhibits M-10 and M-11 demonstrate that Lundry consistently attempted to elicit incriminating statements without success.  Although M-10 is inaudible, M-11 clearly establishes motive and protocol as to how

Lundry attempted to deceive Meador in the hopes of gaining an incriminating statement from him.  Lastly, the government's exhibit M-11 undermines Sgt. Heath's contention that Mr. Lundry was to steer clear of the Gonzalez homicide discussions as numerous occasions Lundry initiates and triggers a conversation regarding the Gonzalez homicide investigation.

Counsel for Michael Meador must speculate not only as to what portions of this statement the government may attempt to introduce into evidence at trial, but also at what stage during Mr. Meador's trial.  Although evidence of uncharged crimes may not be admissible during the guilt phase of a death penalty trial in this matter, they may be admissible in a punishment phase.  In the event, the government has attempted to surreptitiously obtain second phase aggravation evidence by obtaining an unlawful Massiah statement in violation of Mr. Meador's Fifth and Sixth Amendment rights, the government did so with the intent to elicit incriminating statements from Mr. Meador at a stage of judicial proceeding.  The government concedes that Mr. Meador was charged with a capital offense and was represented by counsel.  The government readily admits the statements made in relation to the Gonzalez homicide were exculpatory. (Government's Response p. 32).  Therefore, one must assume the government seeks admission of evidence of an uncharged offense.  Irrespective of whether charges were ever filed as to the alleged murder for hire plot, the government is well aware that this evidence could potentially be used in a punishment phase of a capital murder trial and as such was obtained in violation of Mr. Meador's Fifth and Sixth Amendment rights under the United States Constitution.

Respectfully Submitted,

LERITZ, PLUNKERT & BRUNING, P.C.

By:    /s/ Christopher E. McGraugh
        CHRISTOPHER E. McGRAUGH, #25278
        Attorney for Defendant Michael D. Meador
        One City Centre, Suite 2001
        St. Louis, Missouri 63101
        Telephone:  (314) 231-9600
        Facsimile:  (314) 231-9480


MOLINE, SHOSTAK & MEHAN, LLC

By:    /s/ Burton H. Shostak
        BURTON H. SHOSTAK, # 4359
        Attorney for Defendant Michael D. Meador
        8015 Forsyth Boulevard
        St. Louis, Missouri 63105
        Telephone:  (314) 725-3200
        Facsimile:  (314) 725-3275


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 15th, 2007, a true and accurate copy of the foregoing was filed electronically with the Court to be served by operation of the Court's electronic filing system upon Thomas E. Dittmeier and Cristian M. Stevens of the United States Attorneys Office and all other parties of record.


        /s/  Christopher E. McGraugh