IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| Plaintiff,   ) | Cause No. 1:06-CR-00134 CDP (DDN) |
| ) | |
| v.   ) | |
| ) | |
| ) | |
| MICHAEL MEADOR, et al.,   ) | |
| ) | |
| Defendant.   ) | |

### **DEFENDANT MICHAEL MEADOR'S SENTENCING MEMORANDUM**

COMES NOW Defendant Michael Meador, by and through his attorneys Christopher E. McGraugh and Burton Shostak, and files the following memorandum regarding Defendant's Michael Meador's sentence:

### **INTRODUCTION**

Defendant Michael Meador is a 28 year old male, United States citizen and resident of Ste. Genevieve County, who presents himself for sentencing before this Honorable Court after a jury trial and having been found guilty of Count I: Conspiracy to distribute and possess with the intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. § 841 (a) (1) and 846; Count II: Interstate travel or transportation in aid of racketeering enterprise in violation of 18 U.S.C. § 1952 (a) (2) and (2); Count III: Possession of a firearm in furtherance of a drug trafficking crime resulting in a murder, in violation of 18 U.S.C. § 924 (c) (1).

## I.      SENTENCING OPTIONS

### 1.      Statutory Provision

As to Count 1, the maximum term of imprisonment is 20 year pursuant to 21 U.S.C. § 841 (b) (1) (C).  As to Count 2, Defendant is eligible to be in prison for any term of years or for life pursuant to 18 U.S.C. § 1952 (a) (2).  As to Count 3, the Defendant is eligible for a sentence for any term of years or life imprisonment with no probation consecutive to a sentence rendered in Counts 1 and 2.

### 2.      Guideline Provisions

The United States Probation Office, per its report, suggests a offense total of 45, which is treated as an offense level of 43 and a criminal history category of III, which would produce a guideline sentence of life in prison.  Defendant has filed an objection to the Presentence Report and suggests the appropriate offense level of 40.  If the Court deems the criminal history category of III appropriate, the guideline imprisonment range would be 360 to life[1]

## II.     APPLICATION FOR STATUTORY SENTENCING FACTORS – THE FACTS OF THIS CASE

No limitation shall be placed on the information concerning the background, character and conduct of a person convicted of an offense which a court of the United States may receive in and consider for the purpose of imposing an appropriate sentence. 18 U.S.C. § 3553 states that the Court in determining a particular sentence to impose

---

[1] Defendant further objected to the computation of Defendant's criminal history III as it over represented his criminal history.

2

shall consider the nature and circumstance of the offense and the history and characteristics of the defendant.

    A.    <u>History and Characteristics of the Defendant</u>.[2]

Michael Meador is the youngest of three children born to Virginia Cates. He is a young man in his late-20s born and raised in southeast Missouri. Our investigation has identified him as a likeable country boy. Michael, like most of his family, never completed high school. Michael could not learn like other kids and, therefore, school frustrated him. He was singled out, tested and placed in remedial groups in learning disabled classes. In general, the account of many professionals, neighbors, friends and family would show he was a social kid, who loved playing and visiting with friends. He was a forgiving kid with a kind heart. He did not like to hunt and he suffered when his mother's dogs were neglected.

In many instances, Michael Meador would be considered a survivor and extremely resilient, as he comes from an extremely dysfunctional family. His mother, Virginia Cates, placed her children in homes in which they were neglected and abused, emotionally, sexually and physically. She introduced them to drugs and often left them to fend for themselves. She was married eight times and changed homes frequently. She demanded their respect and was not afraid to beat it into them. She also used unconventional methods to punish, which included checking them into psychiatric wards because they had rebelled against her. Her two daughters left her home on or before their

---

[2] Defendant intends to call Cynthia Short, Mitigation Specialist, to testify the matters set out in this section.

sixteenth birthdays.  Michael found refuge in the homes of friends and while he was gone, Virginia Cates never called or came looking for him.

Virginia's oldest daughter and Michael's sister, Tina, had a drug addiction and three children before she was 20.  The children were all removed from their mother's care.  Like her mother, Tina was abused by the men in her life, until one November night, she committed suicide by pointing a shotgun at her chest and pulling the trigger.  Michael was 11 when he stood next to his sister's coffin.  For the most part, Michael's older sister, Kim, who is a mere four years older, served the role as his mother.  Michael was forced to fend for himself at a young age.

It is unclear who Michael's father was.  In 1974, Virginia Cates married Jerry Meador.  While living with Jerry, Virginia had an affair with Jerry's brother, Billy.  Virginia became pregnant.  Although Jerry Meador is listed as Michael's father on the birth certificate, Jerry's paternity was eventually challenged and it was determined he was not the father of Michael.  It is more than likely that Billy Meador is Michael's actual father.  To this date, Michael still believes that Jerry is his real, biological father.

At 18 years of age, Jerry Meador introduced him to labor.  Jerry had not completed school, but had learned his way on the jobsite.  Jerry was known as "a mule" because he worked hard on the job.  Michael liked to work as an iron worker.  He put in the time and learned the trade.  He climbed the skill ladder and his pay and job opportunities rose as the years went by.  He worked long hours and did not miss work when work was available.  He filed tax returns and donated money to Goodwill.  He helped his neighbors and friends when bills needed to be paid, or if they needed a meal or

ride somewhere.  He is a loving uncle to his nieces and a good friend.  When the victims of Hurricane Katrina needed help, he volunteered with a crew from Robinson Construction to pump the water out of the 9th Ward.

Marijuana is a large part of the fabric of the Meador family.  In this southeast Missouri area, lots of people use marijuana.  Everyone important in Michael's life smoked marijuana.  Some sold it to neighbors and close friends.  No one went to jail or to prison.  Michael's friends smoked marijuana and so did his coworkers.  His father, his uncles, his sister and friends all smoked marijuana.  His grandfather sold moonshine and later sold marijuana.  His uncles used marijuana and harder drugs and they sold marijuana.  As a child throughout his formative years, his mother openly used illegal narcotics in front of him.  Unfortunately, these contacts and the drug usage of family and friends normalized criminal behavior to Michael at a young age.

    B.    <u>Nature and Circumstance of the Offense</u>.

Sergio Burgos Gonzalez was shot to death by Dennis Dinwiddie and Lawan James.  The cause of death was gunshot wounds.  Mr. Gonzalez received three gunshot wound from two different weapons.  Michael took no part in the homicide and, in fact, was not present when Mr. Gonzalez was killed.  Mr. Meador fled the premises and took refuge with Jeremy Hunt in a trailer where he armed himself due to his own apprehension of Dennis Dinwiddie and Lawan James.

Mr. Gonzalez was a major trafficker of illegal narcotics. Michael Meador became acquainted and friends with Mr. Gonzalez as they were roommates and were working together for Robinson Construction.  Both were employed as welders for Robinson

5

Construction.  In addition to being a welder, Mr. Gonzalez was trafficking large amounts of marijuana and other illegal narcotics, particularly to Dennis Dinwiddie.  This relationship between Dennis Dinwiddie and Sergio Burgos Gonzalez began to sour after a botched Federal Express delivery of narcotics to Dennis Dinwiddie which led to Dinwiddie's arrest.  The Dinwiddie and Gonzalez relationship further was strained when Sergio Burgos Gonzalez took $10,000.00 of Dennis Dinwiddie's money which was intended for shipment of illegal narcotics from Mexico.  Although Dennis Dinwiddie and Sergio Gonzalez discontinued their relationship, Michael Meador continued his relationship with Sergio Burgos Gonzalez as a supplier of narcotics to Michael Meador where it was distributed in southeast Missouri.

    Jeremy Hunt, an associate of Michael Meador, testified at trial that he was present during many of these events.  It appears that Mr. Gonzalez arrived in southeast Missouri with a large amount of marijuana. Mr. Hunt testified the amount to be approximately 200 pounds.  This was delivered to Michael Meador and Jeremy Hunt at the home Eve Meador, Michael's grandmother.  Michael Meador was given 24 hours notice prior to Mr. Gonzalez's arrival and was instructed by Mr. Gonzalez that payment for the shipment of marijuana would be due the next day.  Mr. Hunt helped unload and repackage the marijuana in one pound units for redistribution.  Although a significant amount of marijuana was distributed to local dealers, a substantial amount remained.  Both Jeremy Hunt and Billy Meador,  both government witnesses, testified overhearing a conversation in the early morning hours of April 22, 2006; wherein they heard Michael Meador speak to Dennis Dinwiddie and advise him of an excess of marijuana he needed to sell.  Mr.

6

Hunt testified that Michael Meador's plan was to try to bring Mr. Dinwiddie down to purchase the marijuana and keep Dinwiddie and Gonzalez apart.  Mr. Hunt testified that Mr. Meador state, 'all we need to do is keep these guys apart.'  Mr. Hunt also attributes to Mr. Meador that we can stall the Mexicans until Dinwiddie leaves.

Dennis Dinwiddie and Lawan James arrived at Eve Meador's home prior to Mr. Gonzalez and Mr. Cruz's return to pick up their money from the drug sale.  Defendant James testified that he was unaware of the purpose of the trip to southeast Missouri nor believed there to be any violence.  Mr. James testified that Mr. Dinwiddie pulled a large caliber gun from underneath his seat to which Mr. James testified he asked Mr. Dinwiddie what the weapon was for.  Mr. Dinwiddie told Mr. James that it was for protection.  Mr. James consistently stated that he did not believe any violence would come to Mr. Gonzalez and that Mr. Dinwiddie's sole purpose was to recover money lost.  In fact, Mr. James testified that until Mr. Dinwiddie shot Mr. Gonzalez, it was a complete surprise.  Mr. James has always maintained that he did not intend to kill or to harm Mr. Gonzalez and only shot him when he believed Mr. Gonzalez was already dead.  Mr. James testified that it was Dennis Dinwiddie who was in control of the situation directing all inhabitants of the house as to what to do.

In analyzing the motions to suppress, this Court had access to statements made to law enforcement as well as those of a jail house informant, James Lundry.  In those statements, Mr. Meador discusses his attempts to warn Mr. Gonzalez not to come to the house.   Throughout those statements, including statements made to a jail house

7

informant, Mr. Meador reiterates that he did not intend any harm to come to Mr. Gonzalez.

Although, Michael Meador attempted to warn Mr. Gonzalez not to come to the house and that he may be in danger, Mr. Gonzalez and Mr. Cruz arrived at Eve Meador's home in order to receive their money for the marijuana. Upon their arrival, Dennis Dinwiddie and Lawan James abducted both Mr. Gonzalez and Mr. Cruz. Michael Meador and Jeremy Hunt retreated to the bedroom bathroom and hid. Mr. Hunt testified that Michael Meador exhibited a great deal of fear, at which time they climbed out the bathroom window and retreated to a trailer and both Michael Meador and Jeremy Hunt armed themselves with firearms. After the shooting and removal of Mr. Gonzalez's body by Raul Cruz and Lawan James, Dennis Dinwiddie sought out Michael Meador. Michael Meador met Dinwiddie while Mr. Hunt remained in the trailer armed with an AK47 trained on Mr. Dinwiddie. Michael Meador gave Jeremy Hunt instructions to keep the firearm trained on Dinwiddie during this meeting. Dinwiddie instructed Michael Meador and Jeremy Hunt to clean the scene and to pay from the drug sale proceeds Lawan James and Raul Cruz. After the remaining marijuana and monetary proceeds had been divided, Dinwiddie warned Michael Meador, Jeremy Hunt and Raul Cruz never to speak of these events.

As stated above, the Court has had an opportunity to review all of Defendant's statements. The Court will note that on April 27, 2006, Mr. Meador voluntarily appeared at the Ste. Genevieve County Sheriff's Department. Only portions of this interview were played before the jury. The Court had the opportunity to review the entire statement. As

the Court was advised, Mr. Meador was asked to wait an hour and half to speak to a Missouri State Highway Patrolman about the homicide. At that time, according to Sgt. Mills, he admitted to felony murder. However, Sgt. Mills chose not to arrest him and advised him that law enforcement would contact him later. Later that day, he was again contacted by law enforcement and requested to come back to the police station for an additional interview. Again, he recounted the same information, in essence that he facilitated a drug deal wherein Defendants Dinwiddie and James interceded and killed Mr. Gonzalez. After being arrested he again requested an interview with Sgt. Windham of the Missouri State Highway Patrol. Again, he reiterated to them that he had facilitated a drug deal in which Defendants Dinwiddie and James had killed Gonzalez; however, advised him that once he had all the participants in custody he would be at liberty to advise him of all the details of the homicide. Lastly, according to an interview which was conducted in the jail by a jailhouse informant, Mr. Meador again reiterated to the jailhouse informant that he was only facilitating a drug deal when Mr. Gonzalez was killed.

    C.    Co-Conspirators.

Jeremy Hunt, Billy Meador, Genalle Brown and Maria Atlanis were designated by the government as co-conspirators in either Counts 1 and/or 2. None of the individuals named above were charged with any offense arising from the charge or conviction of Michael Meador.

D.  Co-Defendants' Sentences.

Both Defendants James and Dinwiddie had lengthy prior convictions.  Mr. Dinwiddie's convictions are as follows:

Mr. James' convictions are as follows:

On, May 6, 2009, Defendant Dinwiddie was sentenced to life in prison.  On March 12, 2009, Defendant James pled guilty and at the plea hearing the government made a recommendation for a sentence of 35 years.  Defendant James testified at Mr. Meador's trial that he anticipated receiving 35 years for his role in the narcotic distribution and death of Mr. Gonzalez.   James' sentencing has been continued and rescheduled for July 8, 2009.

On June 9, 2009, the government sought leave to dismiss the charge against Raul Cruz.  On June 10, 2009, the Court granted leave dismissing the indictment against Raul Cruz.

## **CONCLUSION**

As noted above, many of the co-conspirators, as set out above, as either Count 1 or Count 2 was not even in this Indictment.  The Indictment against Raul Cruz was dismissed as to his role in Count 1 charged against Michael Meador.  Dennis Dinwiddie is a career offender, with a violent history which denotes eleven felony convictions.  Dennis Dinwiddie was undisputedly the leader.  It is undisputed that Dennis Dinwiddie was the killer.  Dinwiddie's role in the offense is greatly distinguished from that of Michael Meador's role, escaped the crime scene and armed himself out of fear of Dennis Dinwiddie.  Michael Meador should not receive a sentence of life.

10

Lawan James is anticipated to receive a sentence of 35 years.  James, like Dinwiddie, has a long and violent criminal history.  Lawan James, at the direction of Dinwiddie, shot Sergio Gonzalez giving him a life threatening wound.

Based on the life history lead by Michael Meador, his role in the offense, his relatively insignificant criminal history and the disposition of others involved in these offenses, Michael Meador is deserving of a sentence less than life.

For all the reasons mentioned above, Michael Meador requests this Court to order an appropriate, fair and just sentence at the low of the guideline with 360 months and a consecutive sentence as to Count 2 of five years.

        Respectfully Submitted,

        LERITZ, PLUNKERT & BRUNING, P.C.

By:    /s/ Christopher E. McGraugh
       CHRISTOPHER E. McGRAUGH, #25278
       Attorney for Defendant Michael D. Meador
       555 Washington Avenue, Suite 600
       St. Louis, Missouri 63101
       Telephone:  (314) 231-9600
       Facsimile:  (314) 231-9480

        SHOSTAK & SHOSTAK, LLC

        BURTON H. SHOSTAK, # 4359
        Attorney for Defendant Michael D. Meador
        8015 Forsyth Boulevard
        St. Louis, Missouri 63105
        Telephone:  (314) 725-3200
        Facsimile:  (314) 725-3275

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on June 18, 2009, a true and accurate copy of the foregoing was filed electronically with the Court to be served by operation of the Court's electronic filing system upon Thomas E. Dittmeier and Cristian M. Stevens of the United States Attorneys Office and all other parties of record.

                                    /s/  Christopher E. McGraugh